*PH*

RECEIVED
11-15-10
NOV 15 2010  *aw*
11-15-10
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.            )

Donald A. Lehn 877220              )
(Full name and prison number)              )
(Include name under which convicted)       )

PETITIONER                                 )

vs.                                        )

Larry J. Phillips                          )
(Warden, Superintendent, or authorized     )
person having custody of petitioner)       )

RESPONDENT, and                            )

**(Fill in the following blank only if judgment**   )
**attacked imposes a sentence to commence**        )
**in the future)**                                  )

ATTORNEY GENERAL OF THE STATE OF            )

_____                )
(State where judgment entered)             )

10 C 7358
Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

**PH**       **FILED**

**NOVEMBER 29, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Case Number of State Court Conviction:

07-MR-1400

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois

2. Date of judgment of conviction: August 27, 2008

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known) Being a "Sexually Violent Person" under 725 ILCS 207

4. Sentence(s) imposed: Civil Commitment

5. What was your plea? (Check one)    (A) Not guilty      (  )
                                      (B) Guilty          (  )
                                      (C) Nolo contendere (X)
I voluntarily committed myself under 725 ILCS 207/1
If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

Revised: 7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1.  Kind of trial: (Check one):    Jury ( )       Judge only (X)

2.  Did you testify at trial?    YES (X)     NO   ( )

3.  Did you appeal from the conviction or the sentence imposed? YES ( )   NO (X)

    (A)  If you appealed, give the

    (1)  Name of court:   N/A

    (2)  Result:   N/A

    (3)  Date of ruling:   N/A

    (4)  Issues raised:   N/A

    (B)  If you did not appeal, explain briefly why not:

    I voluntarily committed myself in the Illinois Department of Human Services Sexually Violent Persons Treatment Program

4.  Did you appeal, or seek leave to appeal, to the highest state court? YES ( )   NO (X)

    (A)  If yes, give the

    (1)  Result:   N/A

    (2)  Date of ruling:   N/A

    (3)  Issues raised:   N/A

    (B)  If no, why not:  My issue is not a matter for the Illinois courts. *

5.  Did you petition the United States Supreme Court for a writ of *certiorari*? Yes ( )   No (X)

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

* At the time of my conviction for the crimes I committed in the State of Illinois I was a resident of the State of Wisconsin. I am still a resident of Wisconsin (see Sullivan v. Freeman 944 F. 2d 334 (7th Cir. 1991)) I am invoking diversity jurisdiction to have this Honorable Court rule on whether I can be released to return to my family in Wisconsin

2

Revised: 7/20/05

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES ( )  NO (X)

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: N/A

   B. Date of filing: N/A

   C. Issues raised: N/A

   D. Did you receive an evidentiary hearing on your petition?  YES ( )  NO (✓)

   E. What was the court's ruling? N/A

   F. Date of court's ruling: N/A

   G. Did you appeal from the ruling on your petition?  YES ( )  NO (X)

   H. (a)  If yes, (1) what was the result? N/A

           (2) date of decision: N/A

      (b)  If no, explain briefly why not: N/A

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

      YES ( )  NO (✓)

      (a)  If yes, (1) what was the result?

           (2) date of decision:

      (b)  If no, explain briefly why not: Illinois Courts do not have jurisdiction to release me to return to my family in Wisconsin. The Illinois Civil Commitment Act 725 ILCS 207 has no provisions for out-of-state release of non-Illinois residents in the custody of the Illinois Department of Human Services.

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES ( )     NO (X)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

       1.   Nature of proceeding    N/A

       2.   Date petition filed    N/A

       3.   Ruling on the petition    N/A

       4.   Date of ruling    N/A

       5.   If you appealed, what was the ruling on appeal?    N/A

       6.   Date of ruling on appeal    N/A

       7.   If there was a further appeal, what was the ruling ?    N/A

       8.   Date of ruling on appeal    N/A

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?     YES ( )     NO (X)

    A. If yes, give name of court, case title and case number:  N/A

    B. Did the court rule on your petition?  If so, state

       (1)  Ruling:  N/A

       (2)  Date:  N/A

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?     YES (X)     NO ( )

If yes, explain:  Proceedings under the Sexually Violent Persons Commitment Act 725 ILCS 207 continue until the person civilly committed is deemed to be no longer "Sexually Violent"

4

## PART III – PETITIONER'S CLAIMS

1.   State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground.. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)   Ground one   I am entitled to be released to my family in Wisconsin
      Supporting facts (tell your story briefly without citing cases or law)

I am a resident of the State of Wisconsin. The independent psychologist appointed by the Circuit Court of the Nineteenth Judicial Circuit - Dr. Kirk Witherspoon (see enclosed) has "recommended that Dr. Lehn [me] be considered for discharge from IL DHS care and oversight." I have served my entire sentence as imposed and my Mandatory Supervised Release requirement expired on October 30, 2010. I have been in treatment since voluntarily committing myself. I have agreed to be "chemically castrated" through the use of the drug Eligard. It is my understanding that Wisconsin law provides for lifetime anti-androgen treatment

(B)   ~~Ground two~~
      ~~Supporting facts:~~

for sex offenders. Illinois law doesn't. I am a pedophile. Anti-androgen treatment is considered by some to be the most effective treatment for pedophillie (see attached).
      I have never lived in the State of Illinois prior to my incarceration. I have never been employed in the State of Illinois. I have no connection to anyone or any place in the State of Illinois. As a resident of the State of Wisconsin, I am entitled to be released to my family in Wisconsin. Petitioning the court in Illinois for Conditional Release would be fruitless since I have no connection to anyone in this

5

(C) Ground Three

Supporting facts:

State who can provide me with support I need to transition back into society. As such, such conditions would be detrimental to both my welfare and the welfare and safety of the citizens of the State of Illinois.

In Wisconsin, I would live with my Aunt, Mildred Donahue, who has a Masters Degree in Psychology and has been a counselor for victims of sexual abuse in King County, Washington. I am petitioning this court to allow me to be released to live with her in Kewaskum, WI 53040 (1531 State Street) under this Honorable Court's supervision.

(D) Ground Four

Supporting facts:

I will abide by all requirements set forth by this court as conditions for my release. This includes remaining on anti-androgen therapy.

I assert that the Illinois Court's consideration of whether I have a place to stay, employment, treatment and a support network in place before being released on CR as required by 725 ILCS 207 violates my rights since, as a resident of Wisconsin, I can't possibly meet any of these. I assert that the State of Illinois can not force me to become a resident of Illinois as a condition of getting Conditional Release.

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

YES ( )   NO (X)

3. If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

The grounds above for the reasons indicated

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A)  At preliminary hearing ___Alex Rafferty III___

(B)  At arraignment and plea ___Nine North County Street___

(C)  At trial ___Waukeegan, IL 60085___

(D)  At sentencing _____

(E)  On appeal _____

(F)  In any post-conviction proceeding _____

(G)  Other (state): _____

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO (X)

Name and location of the court which imposed the sentence: ___Same Court as civil commitment___

Date and length of sentence to be served in the future _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _____          _____
              (Date)                    Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

___Donald A. Ch___
(Signature of petitioner)

___877220___
(I.D. Number)

___1680 E County Farm Rd___
(Address)

___Rushville, IL 62681-2000___

7                                          Revised: 7/20/05



# KIRK WITHERSPOON, PHD

## CLINICAL & FORENSIC PSYCHOLOGIST

722 - 23RD AVENUE COURT
MOLINE, IL 61265-4624
(309) 762-2922
FAX (309) 762-8394
email: KirkWitherspoon@mchsi.com

## PSYCHOLOGICAL RE-EVALUATION

| | |
|---|---|
| **NAME:** | Donald A. Lehn |
| **CASE #:** | 2007 MR 1400, Lake County, IL |
| **BIRTHDATE:** | 5/25/1962 |
| **SEX; AGE:** | Male;  47 |
| **EDUCATION:** | Doctorate in Biochemistry |
| **OCCUPATION:** | Biochemist Researcher |
| **MARITAL STATUS:** | Single |
| **DATE RE-EVALUATED:** | 2/18/2010 |
| **REFERRED BY:** | The Honorable Judge Victoria A. Rossetti, Lake County, IL |

## REASON FOR REFERRAL:

Dr. Lehn was referred for an evaluation of his mental status relative to the question of his mental health treatment needs, if any.  Specifically, it is questioned whether he is in need of intensive sex offender treatment, whether such should occur in an inpatient or outpatient setting, and/or whether he may be an appropriate candidate for conditional release or discharge into the community.  After serving a term of criminal imprisonment, Dr. Lehn voluntarily accepted classification as a "Sexually Violent Person" under the Illinois Sexually Violent Persons Commitment Act (725 IL CS 207/1 et seq.) after placement within the Illinois Department of Human Services Sexually Violent Persons Treatment and Detention facility 10/30/2007. His progress in treatment and present status are assessed since he would prefer transfer to outpatient care.

## DOCUMENTS REVIEWED:

In the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois Order dated 1/26/2010;
Records DL: 01833 - 01904 Progress Notes 6/09 - 1/6/10;
People's Discovery pages 1695 - 1721;
Sexually Violent Persons Commitment Act Supplemental Examination 4/8 & 4/14/09 and Sexually Violent Persons Commitment Act Psychological Re-Examination 12/17/2009 by David M. Suire, Ph.D.;
Letter to Alex Rafferty, III dated 5/5/09 by Donald A. Lehn;  Notes re Arousal during August 20 Predicate Reading dated 9/16/08 re On Being Aroused During My Predicate

Reading 9/29/08; re: My Arousal During My August 20 Predicate Reading 9/2/08; Factors Affecting my Aug 20 Arousal 10/6/08; Factors that may have contributed to me becoming aroused while reading my predicate 10/14/08; Factors and interventions re becoming mentally aroused while reading 3/14/09; Thought Stoppage Example 3/19/09; Re: Though Stopping/Interventions 3/26/09; Interventions to Prevent me from Becoming Aroused when reading my Predicate Next Time 4/13/09; Factors that may have contributed to me becoming aroused while reading my predicate 10/14/08, 3/10/09; Statement to Treatment Team 4/16/09

**Records for previous evaluations:**
Hands on Victim List: Donald A. Lehn 1975 - 1995; daily notes dated 9/12/08 - 9/30/08, 10/1/08-10/3/08;
Letter to this examiner 11/10/08 by Alex Rafferty, III with letter to this examiner 11/8/08 by Dr. Lehn; copy of letter to Alex Rafferty III 11/4/08 by Dr. Lehn; Letter to this examiner 1/20/09 by Dr. Lehn; Journal entries 4/4/08 - 9/6/08 written by Dr. Lehn;
In the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois:
Case No. 07 MR 1400:
People's Discovery DAL 01422-DAL 01432 sent from the District Court of Maryland; 2008 DHS records pages DAL 01254-DAL 01421 dated 1/1/08 - 8/2008; Plethysmograph Evaluation 12/4/07 by C. Oberhausen, Psy.D.;
Initial Treatment Plan developed 11/15/07; Master Treatment Plan Review 4/17/08; Core Treatment Objectives Checklist 5/29/08; Progress Notes 10/30/07-12/28/07, 1/4/08-8/1/08; Monthly Participation Notes 3/10/08-5/31/08;
Hypertension Clinic Flow Sheet 11/12/07, 3/24/08;
Medical Progress Notes 11/12/07, 12/6/07, 1/3/08, 2/4/08, 3/27/08, 7/10/08; Letter to Dr. Tinwalla 4/13/08 by Dr. Lehn;
Psychiatric Progress Note 1/2/08-7/24/08; Medication orders; Lab results, Radiology report BMD 1/4/08;
Sexually Violent Persons Commitment Act Pre-Dispositional Examination 10/10/08 by David M. Suire, Ph.D. pages 1433-1455;
People's Discovery pages 1456-1608 DHS-TDF clinical and medical records, incident 10/15/08 and grievance 6/18/08, 8/18/08 reports including:
1480-1498 Entry to Treatment Evaluation 8/1/08 by D. Dobier, Psy.D.;
Master Treatment Plan Review 8/21/08; Progress Notes pages 1526-1566 dates 7/1/08-12/5/08; Psychiatric Progress Note 1582-1583 dates 8/28/08, 10/30/08;
Medication orders 7/08-12/08; Radiology report of BMD 7/11/08; Medication listing pages 1590-1600 July 08-Nov 08;
Stipulation and Agreement filed 8/27/08, Agreed Order filed 8/27/08;
Deposition of Dr. Kirk Witherspoon 12/5/08;

CONFIDENTIAL

Letter to this examiner 2/11/08 by Alex Rafferty, III, Attorney;
In the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois:
Gen. No. 07 MR 1400 Order filed 2/7/08;
State of Illinois County of Lake General re No. 95 CF 2329, General No. 95 CF 1831;
Statement of Facts Lake County State's Attorney's Office 95 CF 1831;
Lake County Court Services: Presentence Investigation Report 95CF1831/2329;
General No. 95CF1831 Victim Impact Statements;
State of Illinois In the Circuit Court of the 20th Judicial Circuit Perry County No.
04MR23 Petitioner's Initial Disclosure;
District Court of Maryland for Montgomery County: Case No. 1D00023101 Statement
of Charges;
Affiliated Psychologists, Ltd.: Sexually Violent Persons Commitment Act Evaluation
10/22/07 by Ray Quackenbush, Psy.D.;
Sexually Violent Persons Commitment Act Psychological Evaluation by David M.
Suire, Ph.D dated 12/12/07;
Letters by Donald A. Lehn to: Dr. Tim Walla 11/2/07, 11/19/07; Alex Rafferty, III
undated; to this examiner 4/6/08, 3/14/08; Handwritten log by Dr. Lehn 2/13/08;
Allegation Information pages 19-41 of PsychoSexual Life History by Dr. Lehn;
State of Illinois Department of Corrections: Joliet Reception and Classification Unit
Summary Report 1/2/96; Disciplinary Card 9/3/99 - 9/29/05, Affidavit pages 1-16
dated 4/30/07 by Donald A. Lehn; Grievance 6/15/04;
IL DHS TDF: Initial Treatment Plan developed 11/15/07; Progress Notes 11/16, 11/30,
12/14, 12/28 of 2007 and 1/4/08 by B. Leebold, MSW; Progress Notes 10/30/07 by C.
Oberhausen, Psy.D.

## PROCEDURES EMPLOYED:
Personality Assessment Inventory (PAI)
Wilson Sexual Fantasy Questionnaire
Bumby Scales
Multidimensional Inventory of Development, Sex, and Aggression (MIDSA)
Personal Problems Checklist for Adults (PPC)
Structured Risk Assessment (SRA)
Sexual Violence Risk-20 (SVR-20)
Hare Psychopathy Checklist-Revised (PCL-R)
Static-2002R

# HISTORY (updated to 2/18/2010:

**Personal & Family:** Dr. Lehn reported the following. He was born in West Bend, Wisconsin, and reared in rural settings near LaFarge and Reedsburg, Wisconsin. He was the younger of two brothers from an intact, lower middle income home. His father was a farmer but later drove a truck and operated a construction business. His mother was a homemaker. Dr. Lehn's parents divorced when he was in his late twenties. Dr. Lehn judged he enjoyed a good home life and received sufficient love and attention. He was not neglected during his upbringing. He remembered abuse in the form of being whipped with a belt when he was perhaps five or six years of age. He was unaware of immediate family members having suffered significant mental health problems. However, his father consumed alcohol to excess on weekends.

**Education:** Dr. Lehn did not recount academic or social problems in school. However, he sometimes felt a "loner," since he was smaller than same aged peers and not athletic. Moreover, he did not date.

After completing high school, Dr. Lehn attended the University of Wisconsin at Milwaukee, earning two Bachelor's Degrees in Chemistry and Biochemistry and Zoology. Subsequently he earned both Master's and Ph.D. degrees from Washington State University in Biochemistry.

**Employment:** Dr. Lehn worked during his youth as a farmhand and throughout college years as a stocker, carpenter, lab assistant, teaching assistant, and research assistant. During adult life he has been employed as a researcher by the National Research Council and the University of Wisconsin Medical School. His work involved DNA studies with mice. He denied significant work related problems.

**Medical:** In terms of medical concerns, Dr. Lehn complained of suffering from high blood pressure, poor vision, low frequency hearing loss, and osteoporosis. He has undergone no surgeries apart from that for the removal of wisdom teeth. His present medications include Leupron and Trazodone. In the past he had been given Ambien as a somnifacient.

**Daily Living:** Dr. Lehn denied any history of significant substance abuse problems, apart from experimenting more than before or subsequently with alcohol during his first year of college. He denied illicit drug ingestion or tobacco use. He has never undergone substance abuse treatment. Dr. Lehn exercises by walking and doing other aerobic activities. Before being jailed he had a car and driver's license. He had been

CONFIDENTIAL

able to do his own shopping, cooking, cleaning, and self-care. He lived independently in an apartment. Moreover, he had been a homeowner when living in Maryland. He supported himself financially and had almost no debt. Dr. Lehn remembered enjoying hunting, fishing, hiking, bowling, traveling, and participating in church activities. For a time he put on skits with a group of others who dressed like clowns, always within the context of church related activities.

**Sexual Experiences:** Dr. Lehn has not dated females or engaged in sexual intercourse. Neither has he had sexual contact with similar aged males. However, when he was "little," he and his older brother slept together, occasionally touching each other sexually, that is, "exploring," on four or five occasions. When Dr. Lehn was nine years old, a male cousin, then in his late teens, fondled him once. At about age thirteen, Dr. Lehn and a girl who was two years younger but rather mature for her age liked to "wrestle" with him and attempt to take his pants off. Such ended when his mother stopped it. During mid-teen years Dr. Lehn had a girlfriend for a time and did partake in kissing with her but no sexual behavior. He did not date during high school or college.

Dr. Lehn became aware of his attraction to young males when he reached puberty, growing aroused at the site of a small boy being nude.

Dr. Lehn began masturbating at age thirteen. He remembered once that a six year old female cousin insisted on sitting on his lap. Such resulted in his having almost an immediate erection and orgasm, which he did not anticipate or intend. Indeed he was quite embarrassed about it and relieved that no one found out.

Dr. Lehn recalled that his first intentional sexual contact with another occurring when he was twelve years of age. For approximately ten seconds he fondled a five year old cousin, Scotty, desisting when that lad said "no." Dr. Lehn remembered feeling romantically in love with the young boy. Later, at age fourteen, he and a cousin became aroused and erect while sexually touching each other, that is, fondling.

Dr. Lehn next remembered approximately twelve brief intentional incidents of fondling to young children when he was in college and graduate school. Such resulted in his becoming "highly charged," that is aroused, which he then addressed by masturbating when away from the children.

Subsequently Dr. Lehn took nude photos of a young boy he was watching for a friend. He did the same later with his nephew, the son of his brother. He also sexually accosted that child for a number of years. In treatment he has identified 25 contact victims of inappropriate sexual touching with children. The majority of these were brief, frotteuristic, and targeted males ten or younger. He also acknowledged partaking in voyeurism with children and few incidents of exhibitionism. Dr. Lehn was sent to prison after being caught performing oral sex on still another young child. Dr. Lehn's sexual offending history, in his own words, is appended to an earlier report.

**Sexual Orientation:** Dr. Lehn described his sexual orientation, that is, attraction toward young male children, as something he felt he was born with and has struggled to control. In the past he typically masturbated once per day. Now he seldom does so at all, having only partaken in same once since beginning Leupron. He expressed much relief that that medication has curtailed his urge to act on sexual desires. He maintains a strong longing to love and nurture another. He described himself as having been deeply in love with his nephew, both in parental and romantic ways. He described himself as having had irrational fears of not being able to please a female, although he has found females somewhat sexually attractive.

**Legal:** Dr. Lehn confessed fully after being arrested in 1995 and was then convicted of two counts of aggravated criminal sexual assault/victim younger than thirteen. He was given two sentences, one for ten years and the next for fifteen years, served consecutively. Altogether he spent twelve and a half years in prison as a result.

After having been convicted on those charges, Dr. Lehn was subsequently convicted of child pornography and "sex offense/third degree, underage," for events which had transpired three and four years earlier in Maryland. Although he had been given a number of counts with each of those charges, he plead guilty to one count associated with each and was given concurrent three year terms to be served with his lengthy Illinois sentence. Along with the previously described Illinois sexual offenses, Dr. Lehn had been convicted of child pornography and aggravated criminal sexual abuse in Illinois, garnering concurrent ten and five year sentences, respectively.

**Sex Offender Treatment:** After serving out his term of criminal detention, Dr. Lehn was provisionally placed within the Illinois DHS SVP/TDF facility. He had not undergone sex offender treatment while incarcerated, as he feared reprisals from other inmates if doing so. Indeed he had been accosted, that is, physically attacked, by another once while imprisoned. Dr. Lehn noted that he had also been accused of

committing "threats and intimidation" on two occasions; however, both these nominal infractions were later expunged. Four times he was cited in a minor way for "insolence," which he acknowledged. He was never cited for sexual acting out and did not partake in any sexual contact with other inmates.

Dr. Lehn has renewed his relationship with his brother, while admitting that his sister-in-law has not yet forgiven him for molesting their child. If released from the present facility, Dr. Lehn is uncertain as to what he might do. If given his preference, he would return to Wisconsin in the hope of resuming some research activity or continuing work on improving education software programs for inmates.

Since being housed within the SVP/TDF facility, Dr. Lehn has voluntarily signed up for treatment. He has completed an orientation phase and is enrolled in Phase II of the "Core" treatment groups. He has nearly completed this phase and has also finished ancillary groups targeting thinking errors and substance abusing.

Dr. Lehn has encountered frustration with a treatment provider he has openly regarded as a "bully." (The undersigned has heard many complaints about this treater). For example, Dr. Lehn, in discussing past offending, disclosed becoming "mentally aroused" when reading a description of past offending he had authored, per treatment instructions. He was mistakenly accused of becoming aroused while writing it and, per his description, told by his treater not to address the topic until she instructed same. As a result, his progress was held in abeyance for a year out of apparent concern that his review of the topic would "reinforce" deviant sexual fantasies. Dr. Lehn has then questioned the point of doing so. That is, is his mandated repeated review of past misconduct in the program useful in effecting desensitization or reinforcement?

Dr. Lehn has also complained that other members of his assigned group are homophobic and criticize him for socializing with men in the facility who happen to be gay. He indicated others have refused to understand that his historic attraction to young males does not translate into homosexual attraction toward similar aged males. Dr. Lehn believes that the "blame and shame" emphasis in treatment is not useful and has no validity. He is also subjected to harassment as a "baby raper."

Dr. Lehn also complained of inconsistent instruction from differing treaters. The one generating frustration in his mind has recommended overdisclosure of past misconduct while another has advised to employ "thought stopping." Additionally, in groups he is often subjected to unfounded accusations against which he is then obliged to defend

himself. The treater with which he is frustrated reportedly provides limited structure to the group, unlike another with whom he has enjoyed meaningful sessions.

Dr. Lehn has developed supportive relationships with other residents at the treatment facilities which he nevertheless denies are inappropriate in any respect. Dr. Lehn no longer regards himself as at high risk to reoffend, particularly if he is supported and provided treatment on an outpatient basis. He judged that his reoffending likelihood would be "zero" under those circumstances. He noted that he now masturbates less often than once per month but always to fantasies of adult females, whom he has always found sexually attractive as well. If he begins thinking of young males, he catches himself, as he has learned to do, and does not continue same. He emphasized that he no longer rationalizes sexual misconduct with children as he had previously. While still offending he had told himself that, since he was not harming them physically and in most instances were quite young, that they would not be at risk of long-term harm. He now fully acknowledges that such presumptions were erroneous.

**Emotional:** Dr. Lehn acknowledged depression and anxiety associated with his indeterminant confinement and perceived lack of sufficient support from treatment providers. He denied trouble with feelings of anger, guilt, or fear. He trusts others selectively. He denied crying spells but acknowledged occasional mood swings. He does not experience racing thoughts, energy fluctuations, decreased pleasure, or marked withdrawal. At times he experiences initial insomnia and excessive appetite. He denied lethal tendencies but recounted thoughts of suicide subsequent to his last court hearing. Only occasionally does he have trouble with memory; he denied difficulty with concentration and attention span.

**MENTAL STATUS:**
Dr. Lehn was a neatly dressed and well groomed 47 year old single man of average height and stocky build. He had graying brown hair, brown eyes, and glasses. He appeared to be well oriented for person, place, and time. He gave evidence of no hallucinations, delusions, or grossly inappropriate affect. Both his span of attention and ability to concentrate were good. His recent and remote memory capacities were intact. His speech was coherent, goal directed, mood congruent, evenly paced, of normal volume, sufficiently detailed, and not overly abstract or concrete. His intellectual functioning appeared to fall within the very superior range; he was quite articulate and well spoken. He explained proverbs abstractly and responded well to social judgment questions. He was disclosing and conscientious throughout this assessment. He appeared more anxious and depressed than when evaluated previously.

CONFIDENTIAL

## CLINICAL IMPRESSIONS:

Interview and personality test data were somewhat inconsistent. That is, Dr. Lehn appeared rather anxious but largely denied being sad during interview. However, he marked depression as problematic on a Personal Problems Checklist. Additionally, in standardized personality testing, the only scale significantly elevated related to suicidal thinking. Such occurred despite his denial of any plan or intent to end his life.

Dr. Lehn's distress appears fueled by difficulty he has encountered in treatment in not receiving a sufficient balance between support and confrontation, as he perceives it. Indeed, treatment notes seem replete with negative descriptors of Dr. Lehn, particularly in progress notes for the sessions held by the treater with whom he has been dissatisfied. His sense of hopelessness may be exacerbated by the perception that he is repeatedly condemned for having the very problem for which he has enrolled in treatment. His reported experiences appear consistent with research findings revealing that "shame and blame" as well as relapse prevention sensitization efforts have virtually no treatment efficacy for addressing the problems of those having committed sex offenses.

Other concerns for Dr. Lehn seem chronic, that is, unmet dependency needs. Laudably, he has attempted to meet these through peer contacts which, unfortunately, may be unduly censured by peers, per his report.

Dr. Lehn's presentation style is consistent with impressions gleaned previously in suggesting that he responds to distressing feelings with the defenses of withdrawal, blaming, and obsessive rumination. In the past he was also given to rationalize excessively.

Dr. Lehn also appears to experience considerable grief resulting from alienation of his family members, the realization that he likely will never parent and nurture children, the realistic difficulty he may experience in free society with the moniker "sex offender," and concern about gaining a sufficiently therapeutic treatment experience. He also has concern that others may continue to regard his historic pedophilic sexual interest and arousal dispositively, that is, as tantamount to a likelihood of his acting on same. In this respect he also complained of persisting mischaracterizations in the report of a state evaluator who suggested that he had been a clown at a birthday party for children, for example, to possibly suggest that he was more calculating and predatory historically than he regards is accurate.

CONFIDENTIAL

In conducting comprehensive evaluations for persons with known specific psychological problems, it is useful to conduct a broadband general screening to rule out comorbid or competing diagnoses and/or to rule in additional concerns which must also be considered or addressed. Broadband standardized screens of psychopathology, such as the MCMI-III or PAI, do not include specific measures of sexual deviance. A standardized measure of deviant sexual attitudes, interests, and behavior, the MSI-II, was given to Dr. Lehn in April of 2008, when first seen by the undersigned. His test results were consistent with persons acknowledging past sexual misconduct with children in suggesting that pedophilic urges were ongoing. Those data and less formal questionnaire information also revealed persisting deviant attitudes as well as justifications or excuses for sexual misconduct. He had acknowledged sexual arousal to thoughts and fantasies involving young males. He also endorsed prosocial attitudes and a sincere desire to desist from further sexual misconduct.

For the present assessment Dr. Lehn was administered a different test of sexual deviance, the MIDSA. This standardized and well researched measure provides a history of deviant sexual interest and behavior as well as attendant problems associated with acting out including antisocial, substance abuse, and aggressive behavior. Dr. Lehn's test data were valid. Consistent with his history gathered earlier, he reported virtually no misconduct during childhood or adolescence. Neither did he evidence adult antisocial, substance abuse, or aggressive misconduct. Rather, his difficulties seemed tied almost exclusively to sexual offending against young males as well as the viewing of child pornography. He detailed ways that he manipulated children to gain compliance and acknowledged historic sexual arousal to young male children. He denied strong indications of sexual compulsivity, sexual preoccupation, or hypersexuality. He did not doubt his masculine adequacy. He did register considerable anxiety around women as well as sexual performance anxiety. He also acknowledged prior voyeurism and exhibitionism as well as previously undisclosed fetishism, the latter in reference to adult women. He did not exhibit tendencies toward sadism or acting out anger; however, he acknowledged numerous angry fantasies, in particular against female staff with whom he has felt dissatisfied in his present treatment setting. He did not score high on scales reflecting lack of perspective taking, lack of empathy, tendencies to be conning or superficially charming, impulsivity, negative masculinity/toughness, or hostility toward women generally. He did not evidence pervasive anger but did note prior cruelty to animals, not previously disclosed or addressed. He also noted previously discussed sexual fantasies which, however, do not include aggressiveness or harm to others.

CONFIDENTIAL

Dr. Lehn's results on the MIDSA were also consistent with previously disclosed information, generally speaking, in documenting his pedophilic inclinations. Less formal attitude and interest questionnaire responses seemed to differ significantly from those he endorsed previously. In responses to questions which are, admittedly, rather easy to feign, Dr. Lehn had previously endorsed questionable attitudes or "cognitive distortions" on nineteen of 38 items related to sex with children. Currently he endorsed only two. Such was consistent with other information in revealing that he no longer rationalizes sexual misconduct with children.

## RISK ASSESSMENT:

The SVP program in Illinois was developed to attempt to meet the needs of persons who appear to be at highest risk for sexual reoffending, i.e., recidivism. Therefore, in a clinical opinion about whether or not a person needs intensive inpatient treatment is necessarily predicated upon some estimated reoffense risk, that is, a prediction of future behavior. Unfortunately, studies have shown that mental health professionals have limited skill for accurately predicting behavior based upon a subjective or unguided assessment process (1, 2). As a result, to aid clinicians to help the court to gauge risk, a number of actuarial schemes are being devised to try to improve predictive accuracy. Initial modest indications of improvement in said accuracy based upon the use of actuarial schemes have led in recent years to a frequent but far from universal conviction that their use indeed improves predictive accuracy (3). That is, controversy still exists about the use of actuarial schemes, since their initial promise has not always been realized. Recent research has suggested that the bases for frequently referenced data, that is, in a commonly cited meta-analysis, are actually in large measure rather poor in quality and thus not terribly reliable. Moreover, many of the actuarial schemes which have been devised have not held up consistently well in independent cross-validation studies (4). For example, the stability of risk category relapse percentage estimates for the MnSOST-R has not been established (5). Recent data also revealed that the MnSOST-R and Hare PCL-R are not scored reliably in adversarial application (6). Additionally, the Hare PCL-R, a tool used to measure general criminalistic tendencies, is regarded by those currently researching it actively as not being sufficiently reliable for exclusive use in forensic decision making (7).

Developers of actuarial schemes acknowledge that they are inherently somewhat biased in orientation since they identify risk variables related to recidivism but not moderator variables, about which less is known. Actuarial scheme developers also openly note that most actuarial tools rely upon variables which are primarily static in nature. In so doing they omit dynamic variables, which can change over time, and situational ones,

which may defy prediction altogether. Actuarial scheme developers acknowledge that, to date, they are only "modest" predictors of risk and typically have very limited utility for gauging risk assessment or reduction in someone who has already undergone substantial treatment for sex offending tendencies (8).

The Hare PCL-R, although not a specific sex offender recidivism risk prediction tool, was also included because a score on this measure is included in the SVR-20 and, if high, can increase reoffense risk (9, 10). The PCL-R is used to rate psychopathy, originally hypothesized by the test author to represent an end point "taxon" or discrete category of severe antisocial attitudes and behavior typically associated with higher risk of general offending, not necessarily specific sexual reoffending or sexually violent reoffending. The highest score possible on this measure is 40. Persons with a score of 30 or above were considered to be "psychopaths." However, most data now suggest that antisocial tendencies are best viewed as continuous phenomena, not discrete ones (11). The average score for prison inmates is 24 and that for unincarcerated males about seven. Dr. Lehn's score of 9, reflecting historic trends, fell at the 5.7% when compared with a population of prison inmates and at the 10.2% when compared with forensic mental health patients. However, the revised manual for this measure allows for adjustments in scores for persons whose negative behavior in question has not been manifest for the past five to six years (12). Said adjustment would apply to Dr. Lehn. If evaluated only based upon functioning in more recent years, his score of 8 would fall at the 5th% when compared with a population of prison inmates and at the 8th% when compared with forensic mental patients. Said results were consistent with the other scientifically derived measures of antisocial tendencies employed during this and a previous evaluation, the MCMI-III, the MSI-II, and the MIDSA, in not suggesting antisocial tendencies for Dr. Lehn. Indeed, his score is at a level consistent with that of the average male in free society. It should be noted as well that research is clear that antisocial behavior tends to wane in one's fourth decade of life. Dr. Lehn is in the latter portion of his fifth life's decade. Additionally, the Hare PCL-R manual clarifies that behavioral manifestations of antisociality abate in one's midforties, such that even individuals with high PCL-R scores may be at no greater risk of general criminal recidivism than those with low scores.

The SVR-20 is a guided clinical assessment tool which does not provide cut-offs for estimating risk categorization but does permit at least some consideration of dynamic variables (13). It is employed herein since recent research suggested that this method is as accurate as the most widely researched actuarial scheme, the Static-99. Such is termed a structured professional judgment instrument which was theoretically

developed and includes variables shown by research to have, in most instances, predictive utility with respect to sexual reoffending. Although not initially developed for recidivism risk prediction, this measure is now in wide use for this purpose, since it has shown good utility in doing so. That is, the SVR-20 has enjoyed very good empirical support. It takes into consideration one's general psychosocial adjustment, pattern of sexual offending, and future plans. This method also permits allowances for changes over time due to such things as treatment benefits or age. Historically, Dr. Lehn's functioning as gauged by this measure fell within the "low" sexual reoffense risk category. However, given that this measure also allows for alterations in estimates based upon functioning in more recent time, are slight improvements in Dr. Lehn's status affirm even more strongly that his categorical risk classification is "low."

Dr. Lehn was also evaluated with the Static-2002R. This measure is slightly more accurate than the former Static test iterations. The results of this measure were interpreted cautiously, since it was not developed to gauge sexually "violent" risk, per se. As a result, it casts too wide a net with respect to the "SVP" relapse classification question. Moreover, this measure does not include anything other than fixed or "static" variables in consideration of risk. Such is a big problem since research has suggested that additional dynamic variable consideration greatly improves risk assessment estimates, that is, if done properly (14, 15, 16). Therefore, the Static-2002R is used to establish a historic baseline of risk estimate which is then to be appropriately modified with consideration of dynamic risk variables that are grouped in a cross-validated manner.

Worth sharing is that the authors of the Static-2002R issued new interpretive experience tables in 2008 with risk percentages more consistent with current demographic trends. Such was necessary since the original sample for the Static-99 was from the 1980s and earlier when sex offender management practices and consequences for sex offending were consistently different than presently. Additionally, the original sample size for the Static-99 supportive data was much smaller than current evolving combined samples. Limited with the current data set is sample composition, which includes some older data from the United States and more current data typically from foreign counties. Approximately a dozen studies have come out in recent years across various states in this country revealing risk estimates roughly one-half those of the original Static-99 norms (17). The current published experience table estimates by the authors of the Static-2002R for the most part do not yet include these and cite an average decrease in risk relative to original sampling data ranging from 35 to 40 percent. Possibly helpful is that the authors of the Static-2002R have provided two additional sets of figures in

2008, those associated with higher and lower risk groups, and gave percentage estimates associated with specific scores rather than mere general bin estimates (18). However, those risk group data sets were smaller, not clearly comparable to individuals in this country, defined by some untested assumptions, and predictively less accurate than the larger recent data set.

The Static-2002R, which was released in September of 2009, improves upon an earlier iteration of that measure by making more accurate age adjustments for declines in offending due to age, insufficiently accounted for previously. Normative data for the revised versions have been upgraded slightly from the previous year; however, difficulties with minor alternate normative samples have not yet been adequately resolved. Accordingly, the most statistically reliable sample set is the large, general one comprised of (nearly) all current experience table research referenced to date by the authors of these measures.

Dr. Lehn's score of "5" on the Static-2002R placed him within the "moderate" relative reoffense risk category. Important in interpreting this label is to understand that such represents a relative categorical estimate, not an absolute reoffense estimate. In other words, it indicates where Dr. Lehn falls relative to other convicted sex offenders in a comparative ranking. The score he achieved actually placed him in a group of prior sex offenders whose rough average reoffense risk over a five year span was 15%. Research indicates that most reoffending which does occur will happen within the first three years of release from confinement and that, after ten years of good conduct following release from detention, reoffending is quite negligible. Generally speaking, reoffending risk for Dr. Lehn would be expected to decline at a rate of about 4-5% of measured risk per year. The above is only in reference to a baseline static variable estimation which must then be appropriately modified with dynamic variable consideration.

The Structured Risk Assessment (SRA) method for gauging dynamic variables with the use of clinical judgment includes consideration of four functional domains (19). These include deviant sexual interests, distorted attitudes, socioaffective dysfunction, and self-management difficulties. This method for assessing dynamic variables in a systematic cross-validated manner is the only one which has shown positive results in at least three studies and has demonstrated improved estimate accuracy (incremental validity) when applied to static measure scores. Dr. Lehn exhibited ongoing significant difficulty in the majority of these measured areas. The first of these, the sexual interest domain, is registered as problematic in view of his acknowledged historic child

CONFIDENTIAL

preference. However, it may be useful to consider that treatment has not been successful in altering preferences of this sort and, indeed, it typically is not even registered as a legitimate goal of treatment as a result. Rather, the efforts expended are in the service of "managing" said preference. In this regard, Dr. Lehn is doing well.

Dr. Lehn does not exhibit difficulty in the next domain, that of distorted attitudes, which he had displayed previously. Within the socio-affective domain, the five subcategories include dysfunctional self-evaluation, emotional congruence with children, lack of emotionally intimate relationships with adults, callous, shallow emotionality, and grievance thinking. Dr. Lehn's historic felt emotional congruence with children continues; however, he has also developed supportive ties to adult residents within his present facility, as would be considered optimally adaptive. Such does not include a strongly intimate relationship as, indeed, any sexual expression of same would be proscribed in his present setting. He does not evidence dysfunctional self-evaluation or callous, shallow emotionality. He does display grievance thinking which, fortunately, seems situational and not indiscriminate. As a result, the negative effect potentially associated with concern in this domain seems quite limited.

The last dynamic domain considered within the SRA framework relates to self-management. Subcategories include lifestyle impulsiveness, resistance to rules and supervision, poor problem, and poor emotional control. Dr. Lehn appears to have been impulsive in the past but does not display problematic impulsive inclinations presently. Neither does he appear to be generally resistant to rules or supervision. Limited problem solving may be indicated by insufficient consequential thinking; nevertheless, this area of concern is improving. He does not appear to generally display poor emotional control, that is beyond what might be considered average in a fairly confrontation treatment setting.

Dr. Lehn's SRA produced estimate would place him within a "low-moderate" to "moderate" relative sexual reoffense risk category. When used to modify his Static-2002R estimate, such would lower it slightly or not alter it. In other words, his reoffense risk category would be akin to those with 7-15% rough average measured reoffense risk within a five year span. Said estimate again would be expected to drop at an average of 4-5% of measured risk per year as he ages. This score was slightly higher than Dr. Lehn's risk estimate as generated by the SVR-20.

Other independent factors strongly influencing sexual reoffense risk include current age, infirmity, and "denial" (20). The vast majority of research addressing the effects of current age upon sexual reoffending reinforces the "age invariance law," which affirms that all forms of criminality decrease with advancing age (21-32). Dennis Doren has written a treatise arguing against the age invariance law in relation to sexual offending but acknowledged at an ATSA conference that his position on the subject is not the generally accepted one. Declines in sexual misconduct with age tend to vary to some degree according to target choice. Rape tends to be a young man's crime which decreases rapidly in occurrence with advancing age (see appendix A, 33). Child molesting tends to diminish slower, with the exception of incest offending, which decreases very rapidly. Dr. Lehn's age, when considered with his historic type of sexual offending, did not suggest a needed alteration in his estimated sexual reoffense risk categorical likelihood. The age variable is also reflected in his Static-2002R estimate, described above.

The issue of infirmity, in view of Dr. Lehn's not suffering severe or debilitating medical problems, would not appear to merit significant consideration. Until the recent past it was commonly thought that denial was a universally negative marker relative to reoffending risk. Indeed, for persons with strong antisocial tendencies who commit rape, ongoing denial seems to be a risk factor for reoffending. However, research now clearly shows that, quite paradoxically, the direct opposite is strongly true for those who have been convicted of sexual crimes against minors (with the exception of incest offenders). That is, those who admit to said criminality have a greater reoffense likelihood than those who do not. Offense denial for pedophilic offenders is not only not a risk factor but actually a protective one. Dr. Lehn's sexual misconduct included illegal sexual behavior with many underage children. His lack of denial of same may be regarded as an aggravating risk factor. As a result, his "low-moderate" to "moderate" relative reoffense risk classification is likely most accurate.

In summary, balanced consideration of adjusted actuarial and structured professional judgment risk assessment procedures employed in the present evaluation placed Dr. Lehn within a "low-moderate" to "moderate" sexual reoffense risk category relative to other sexual offenders his age. However, his absolute risk categories have rough average estimated reoffense risk percentage estimates of 7-15% over a five year span. His risk will decrease considerably as he ages, that is, at an average rate of approximately 4-5% of measured risk per year.

CONFIDENTIAL

## DIAGNOSTIC IMPRESSIONS:

Axis I:   302.2  Pedophilia, sexually attracted to males, nonexclusive type
          309.28  Adjustment Disorder with mixed anxiety and depressed mood, chronic
          307.23  Tourette's Disorder, per history
          Rule out:  Sleep Disorder
Axis II:   Rule out:  Personality Disorder NOS with dependent and compulsive features
Axis III:  Per history:  high blood pressure, visual impairment, low frequency hearing loss, osteoporosis
Axis IV:   Primary support, social, legal concerns
Axis V:    Current GAF 60

## DISCUSSION:

Dr. Lehn is civilly detained after incarceration due to having committed sexual offenses against children and previously expressed concern that he may be at high risk to continue doing so. By his own description he is a "true" pedophile with nearly exclusive sexual preference for young males. He is also attracted to adult females but has historically feared being unable to function adequately to satisfy them.

Dr. Lehn educated himself to a very high level and functioned in most respects as a responsible, contributing member to society. He did not have daily living problems, substance abuse tendencies, aggressive proclivities, or antisocial inclinations. He no longer endorses deviant sexual attitudes. He continues to have pedophilic sexual interests but no longer masturbates in a way which might reinforce those. As mentioned, completely ridding oneself of deviant sexual interests is not a recognized legitimate goal of sex offender treatment; rather, managing acting out tendencies sufficiently is desired.

Dr. Lehn voluntarily initiated sex offender treatment and accepted being labeled as a "sexually violent person." He has realized reduced sex drive from antiandrogen medication and has become fully invested in treatment groups. Unfortunately, he has been frustrated by what he regards as insufficient support, excessive confrontation, false presumptions, unnecessary delays, and inconsistent advice. Nevertheless, he has attempted to utilize benefits offered and has maintained a strong resolve to forgo deviant and criminal sexual behavior in the future. He maintains prosocial values and goals.

CONFIDENTIAL

**Opinions About State Evaluations:** This examiner has had an opportunity to review other assessments of Dr. Lehn performed by evaluators hired by the State. These consistently appear to contain errors and limitations in procedure and conclusion. The only assessment of which this evaluator is aware that is current was authored by Dr. Suire December 17th, 2009. This evaluation did not include evidence that Dr. Lehn was assessed with standardized, broadbased psychodiagnostic tests nor more specific tests of sexual psychopathology. It is thought to be good practice within the field of clinical psychology to integrate information from a broad convergence of data. In Dr. Lehn's case such could include historical information, interview data, treatment information, and standardized diagnostic testing. The lack of testing in the state report sharply delimits the foundation for impressions shared.

It is also noted that Dr. Suire's evaluation did not include reference to a review of any independent assessments, such as those authored by the undersigned. Such may well reflect selective attention to information, i.e., a confirmatory bias.

In addition, this evaluation, like others before it, appeared to offer diagnostic conclusions which were incorrect. Dr. Lehn was described as suffering from pedophilia, sexually attracted to both, exclusive type. Such refers to sexual attraction to both genders of children and suggests an absence of sexual attraction to adults. Dr. Lehn is sexually attracted to male children and adult females but not female children. Dr. Suire also opined that Dr. Lehn suffers from a personality disorder NOS with histrionic and narcissistic traits. Such was inconsistent with the impressions generated by the undersigned which appear to have greater empirical foundation. Dr. Lehn exhibits compulsive and dependent tendencies rather strongly but not narcissistic or histrionic ones. Quite notable is that standardized data gleaned during the present assessment did not support the narcissistic reference.

In addition, the risk assessment procedure employed by Dr. Suire is outdated. Laudable was his employment of the updated Static measure, the Static-99R. However, the percentage estimate associated with same (which did not include reference to a numerical score on that measure) seemed greatly exaggerated. Dr. Suire also used a ten year estimate, when it is clear that such are not as accurate as five year estimates and may appear falsely inflated for group selection effects rather than a clear increase of individual risk. That is, individual risk to reoffend virtually always decreases as one ages.

CONFIDENTIAL

Dr. Suire seemed to more clearly err in employing the MnSOST-R. That measure is associated at present with no demographically cross-validated norms. Preliminary more recent data referenced by the author of that measure but not yet published revealed high risk group reoffense estimates 45% lower than those in the original data base. This measure also appears to have mis-scored, even if it were applicable.

To clarify, the author of the MnSOST-R, Dr. Epperson, and now other researchers (and the ATSA organization) have voiced or published information to register a very significant drop in sexual reoffending during the past fifteen years or so. Such means that information gathered in support of the MnSOST-R seventeen years ago is no longer consistent with current demographic trends. Dr. Epperson opined that reduced detected reoffending is primarily the result of increased community supervision in the recent sample which he studied rather than the benefit of sex offender treatment. He added that earlier higher reoffense risk estimates might still accurately gauge reoffending risk in an absolute sense whereas actual "threat" to the community on the street would be considerably less due to improved community supervision, hence the 45% reduction from earlier figures in application.

Dr. Epperson's suppositions regarding the basis for reduced sexual reoffending risk may or may not be merited or eventually cross-validated in other samples. As mentioned, he has not yet published the new data which might be consistent with current demographic trends. His argument that older data, gathered in real life situations, now can still be referenced rather than current real life threat does not seem logical. Important as well is this regard is that ethical standards for psychologists require employing tests with data samples comparable to the persons being evaluated. That Dr. Epperson's prior data base is not consistent with current demographic trends suggested such should not be employed at this point in a risk assessment. Neither should any newer data he references be used dispositively unless or until he publishes same in a peer reviewed manner and it is cross-validated so that it can be deemed reliable and applicable to current populations being measured. Any data base utilized must reflect current demographic trends, as has been attempted to a limited degree in recent time by the authors of the Static-99. To reiterate, referencing outdated and inflated MnSOST-R figures at this point seems inappropriate, ill-advised, and misleading. Dr. Suire's "low risk range" estimate for Dr. Lehn on the MnSOST-R, purportedly reflecting a "twelve percent chance" of being arrested for a new sexual offense within a six year span, appears inconsistent with his overall conclusions.

Also misguided would be the employment of a nonvalidated "adjusted actuarial" technique which recent studies reviewed by the authors of the Static-99 have revealed actually decreases predictive accuracy. Dr. Suire relied upon this nonvalidated technique in a willy-nilly fashion, casting very serious doubt upon his conclusions. Such was even made worse by the inclusion of two which are both redundant and incorrect, viz., "attitudes tolerant of sex crimes" and "child molester attitudes." This (these) item(s) does (do) not apply to Dr. Lehn any longer.

Also incredible is that Dr. Suire used actuarial assessment tools producing "moderate-low" and "low" relative sexual reoffense risk categorical estimates and then somehow opined that Dr. Lehn poses a "substantial risk" for sexual reoffending. Said opinion flies in the face of his own data. When state hired evaluators have nominal "high" risk estimates to offer, those estimates are strongly referenced. Without them the lower ones are now ignored? Dr. Suire's conclusion seem utterly unwarranted.

Dr. Suire then discussed the question of age as it relates to Dr. Lehn in a manner which has now been indisputably proven to be false. Data illustrated in graphs appended to this report from a chapter authored by Dr. Barbaree apparently strongly contributed to a decision by the authors of the Static measures to revise them to reflect the steady decline of sexual reoffending risk with age. Dr. Suire's discussion of this topic is not up to date or accurate.

Another commonly referenced nonfounded nominal impediment to release from civil detention is the notion that purported agreement among state evaluators regarding one's presumed risk somehow strengthens the value of their opinions. However, such can be and often is recursive, something described in the social psychology literature as "social construction of reality" (37). It would also be false to necessarily assert that Dr. Lehn will benefit more from inpatient treatment than outpatient care, since recent studies have shown outpatient treatment to be more effective (38, 39). Additionally, it would be misleading to argue that adequate outpatient care would be unavailable locally, since, were Dr. Lehn to be conditionally released, he would be sent to a location where DHS would be obliged to provide adequate outpatient care and supervision; currently three sites in Illinois are set up by DHS and so employed for those having conditional release as SVPs.

Finally, state hired evaluators seemed to err in definitively opining about a purported link between diagnoses of mental disease ascribed to Dr. Lehn and a presumption regarding one or more of these "predisposing" him to engage in acts of sexual violence.

Such opinions appear to overreach.    Offering direct predictions with respect to recidivism is problematic because of a glitch in the phrasing of the Illinois SVP statute. This statute requires that one be deemed to suffer from a mental disorder which creates a "substantial probability" that he or she will engage in acts of sexual violence.  That is, the statute rests upon a supposed "causal nexus" between a mental disorder and a presumed likelihood of acting out.  Yet "substantial probability" is not well defined. Moreover, the statute's phrasing is very problematic from a clinical standpoint since the existence of a mental illness, in and of itself, is not dispositive with respect to acting out potential or behavioral prediction.  As stated in DSM-IV-TR, "The fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behavior that may be associated with a disorder.  Even when diminished control over one's behavior is a feature of the disorder, having a diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time."    However, "It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability," (page xxiii).  In addition, "When the DSM-IV category's criteria and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood.  These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis.  In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect'," (page xxxii).  And finally, "The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion" (page xxxii).

As a result, a mental health professional would have no basis for opining about the legal "ultimate issue" and would need to punt that question to the trier of fact.  (See Appendix B.)  One can suffer from a mental illness and not act upon it, just as one could act out a behavior that does not result from a mental illness.  A mental diagnosis is descriptive or, at most, explanatory, but not prescriptive.  In other words, if the acting out potential that is to be deemed worthy of SVP categorization and treatment is predicated upon the presence of a mental disorder in the Illinois law, a "but for" test, it does not appear supported by behavioral science.  Neither from this evaluator's nonlegally trained perspective does it seem to comport with the law's view of a person as an "independent agent."  In the law one is held responsible for one's actions unless

one is irrational or the behavior is excused. Just as a mental diagnosis does not excuse behavior, neither does it compel it, or no one with a diagnosis could be held accountable for his or her actions (40, 41).

## RECOMMENDATIONS:

It is recommended that Dr. Lehn be regarded as falling within a "low-moderate" to "moderate" sexual reoffense risk category in comparison to other convicted sexual offenders.

It is recommended that Dr. Lehn be regarded as akin to sexual offenders having an average of 7-15% risk of reoffending over a five year span following release from detention and that such figure be deemed likely to decrease at a rate of 4-5% of measured risk per year.

It is recommended that the above described reoffense risk percentage estimates not be regarded as falling within a "much more likely than not" range necessary for involuntary civil commitment. It is therefore recommended that Dr. Lehn be considered for discharge from IL DHS care and oversight.

It is recommended that, if Dr. Lehn continues to merit the label of "sexually violent person" in the mind of trier of fact, that he be transferred to conditional release, that is, ongoing sex offender treatment on an outpatient basis. In this regard it is noted that IL DHS will send Dr. Lehn where it has already established adequate supervision and treatment provisions for his behavioral management and care within the community.

It is recommended that Dr. Lehn be offered assistance in receiving medical care, housing, and adequate employment. In this respect it is specifically not recommended that he unrealistically be required to already have housing and employment established within the community, since he would be assigned to a location mandated by DHS. DHS has a track record and obligation for aiding those attaining conditional release status to function adaptively in society.

Thank you very much for this referral.

Kirk Witherspoon, Ph.D.
Clinical & Forensic Psychologist

CONFIDENTIAL

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 23 of 31

Reference list for Dr. Donald Lehn., 2010

1. Hanson, R. Karl and Kelly E. Morton-Bourgon. The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis (2007-01). Available at www.SGC.GC.CA.

2. Helmus, Leslie. A Multi-Site Comparison of the Validity and Utility of the Static-99 and the Static-2002 for Risk Assessment with Sexual Offenders. (2007) Available at www.SGC.GC.CA

3. Litwack, T. R. (2001) Actuarial Versus Clinical Assessments of Dangerousness. *Psychology, Public Policy and Law*, Vol. 7, No. 2, 409-443, American Psychological Association.

4. Lloyd, M. D., Grove W. M., Minnesota Sex Offender Screening Tool: The Uselessness of the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) in Commitment Decisions. Available from Dr. Grove: Department of Psychology, University of Minnesota.

5. Langton, C. M., Barbaree. H. E., Harkins, L., Peacock, E. J., Arenovich, T., Further Investigation of Findings Reported for the Minnesota Sex Offender Screening Tool-Revised. *Journal of Interpersonal Violence*, Vol. 23, No. 10, 10/2008, 1363-1379.

6. Murrie, Daniel C., Boccaccini, Marcus T., and Tussey, Chriscelyn (2009). Rate (Dis)Agreement on Risk Assessment Measures in Sexually Violent Predator Proceedings. Psychology, Public Policy, and Law, 15, No. 1, 19-53.

7. Skeem, J., Psychopathy Assessment: Promoting informed and judicious practice. *AP-LS News, Winter*, 2003, pp. 6-8.

8. Hanson, R. K., Morton, K. E., & Harris, A. J. R. (2003). Sexual offender recidivism risk: What we know and what we need to know. R. A. Prentsky, E. S. James. & M. D. Seto (Eds.), *Sexually coercive behavior: Understanding and Management* (Vol. 989, pp. 154-166). New York: Annals of the New York Academy of Sciences.

9. MacPherson, G. Predicting escalation in sexually violent recidivism: Use of the SVR-20 and PCL:SV to predict outcome with non-contact recidivists and contact recidivists. *The Journal of Forensic Psychiatry & Psychology*, Vol 14 No 3. 12/2003, pp 615-627.

10. Guay, J-P. Knight, R. A., Ruscio, J., Hare, R. D. A Taxometric Analysis of the Latent Structure of Psychopathy: Evidence for Dimensionality. *Journal of Abnormal Psychology*. 2007, Vol. 116, No. 4. pp 701-716.

11. Hare, R.D. (1991). *Manual for the Hare Psychopathy Checklist Revised*. Toronto, Ont: Mutli-Health Systems.

12. Hare, R.D. (2003). "The Psychopathy Checklist-Revised, 2nd Edition. Toronto. Ont: Mutli-Health Systems.

13. Barbaree, Howard E., Calvin M. Lankton. Ray Blanchard, and Douglas P. Boer. (2008) Predicting Recidivism in Sex Offenders Using the SVR-20: The Contribution of Age-at-Release. *Sexual Abuse: A Journal of Research and Treatment*, 18,423-440.

14. Hanson, R. K., Harris, A. J. R. Where Should We Intervene? Dynamic Predictors of Sexual Offense Recidivism. *Criminal Justice and Behavior*. Vol. 27 No. 1, 2/2000. pp 6-35.

15. Thornton, David. (2002). Constructing and Testing a Framework for Dynamic Risk Assessment, *Sexual Abuse: A Journal of Research and Treatment* 14(no. 2), 139-153.

16. Daniels, L., & Thornton, D. Using the Structured Risk Assessment Model to Guide Treatment Planning. Presented at the ATSA Conference. San Diego, CA, 10/31/07.

17. Abbott, Brian R. (2009). Application of the New Static-99 Experience Tables in Sexually Violent Predator Risk Assessments, Sexual Offender Treatment, Vol. 4. Pp. 1-31.

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 24 of 31

18. Hanson, R. K. & Thornton, D. Recommendations for Interpreting Multiple Norms for the Statuc-99. Commentary at the 27th Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers, Atlanta, Georgia, 10/23/08.

19. Daniels, L., & Thornton, D. Using the Structured Risk Assessment Model to Guide Treatment Planning. Presented at the ATSA Conference. San Diego, CA, 10/31/07.

20. Thornton, D., Knight, R., Nunsen, K., Harkins, L., Beech, A. R., & Firestone, P. A Closer Look at the Relationship Between Denial and Recidivism, including: "Is Denial Always Bad?" Presented at the ATSA Conference in San Diego, CA, 11/2/07.

21. Barbaree, H. E., Langton, C. M., and Blanchard R. Predicting Recidivism in Sex Offenders Using the VRAG and SORAG: The Contribution of Age-at-Release, International Journal of Forensic Mental Health, 2007, Vol. 6, No. 1, pp 29-46.

22. Barbaree, Howard E., Calvin M. Lankton, Ray Blanchard, and Douglas P. Boer. (2008) Predicting Recidivism in Sex Offenders Using the SVR-20: The Contribution of Age-at-Release. Sexual Abuse: A Journal of Research and Treatment, 18,423-440.

23. Trowbridge, B.C. and Adams J., Sexually Violent Predator Assessment Issues, The Trowbridge Foundation Report, Vol. VIII, Iss. 4/Vol. IX, Iss. 1 Fall 2006/Winter 2007, p. 11-12.

24. R. Wollert. Validation of a Bayesian Method for Assessing Sexual Recidivism Risk. web site: richardwollert.com

25. Wollert, R. and Waggoner, J. Respecification of Static-99. A Respecification of Hanson's Updated Static-99 Experience Table that Controls for the Effects of Age on Sexual Recidivism in a Sample of Young Offenders, presented at the 2007 Convention of the Association for the Treatment of Sex Abusers at San Diego, CA.

26. Thornton, D. Age and Sexual Recidivism: A Variable Connection. Sexual Abuse: A Journal of Research and Treatment (2006).

27. Hanson, R. K. The Validity of Static-99 with Older Sexual Offenders 2005-01, Public Safety and Emergency Preparedness Canada.

28. Sampson, R. J., & Laub. J. H. Life-course desisters? Trajectories of crime among delinquent boys followed to age 70. Criminology, 41, #3, 2003, pp 555-592.

29. Fazel, S., Sjoostedt, G., Langstrom, N., and Grann, M. Risk Factors for Criminal Recidivism in Older Sexual Offenders. Sexual Abuse: A Journal of Research and Treatment (2006)

30. Harris, G. T. and Rice, M. E. Adjusting Actuarial Violence Risk Assessments Based on Aging or the Passage of Time. Criminal Justice and Behavior, Vol. 34, No. 3, March 2007, pp 297-313.

31. Doren, D. M., Age Effect on Sexual Offenders' Risk, What Do We Know About the Effect of Aging on Recidivism Risk for Sexual Offenders?, Sand Ridge Secure Treatment Center - Evaluation Unit at 301 Troy Drive, WI 53704.

32 Hanson, R. K., Recidivism and Age Follow-Up Data From 4,673 Sexual Offenders. Journal of Interpersonal Violence, Vol. 17 No. 10, 10/02, pp 1046-1062.

33. Hanson, R. K. & Morton-Bourgon, K. E. (2009) The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis. Psychological Assessments, 21 (1), 1-21.

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 25 of 31

34. Hanson, R. K. & Morton-Bourgon, K. E. (2009) The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis. *Psychological Assessments,* 21 (P. 1-21.

35. Lacombe, D. Consumed with Sex: The Treatment of Sex Offenders In Risk Society. *Brit.J. Criminol (2008)* 48, pp 55-74.

36. Marques, J. K., Wiederanders, M., Day, D. M., Nelson, C. and van Ommeren A. Effects of a Relapse Prevention Program on Sexual Recidivism: Final Results From California's Sex Offender Treatment and Evaluation Project (SOTEP). *Sexual Abuse: A Journal of Research and Treatment.* Vol. 17, No. 1, 1/05 pp 79-107.

37. Campbell, T. W. (1998) Smoke and Mirrors: The Devastating Effect of False Sexual Abuse Claims, Insight, New York. Read discussions re "Rumor formation."

38. Parhar, K. K., Wormith, J. S., Derkzen, D. M., and Beauregard, A. M. Offender Coercion in Treatment A Meta-Analysis of Effectiveness. *Criminal Justic and Behavior.* Vol. 35. No. 9. 9/08, pp 1109-1135.

39. Losel, F., & Schmucker, M. (2005) The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1,* 117-146.

40. Morse S. J., Undiminished Confusion in Diminished Capacity, The Journal of Criminal Law & Criminology, Vol. 75/Number 1/Spring 1984

41. Hart, S. D., Laws, R. D., and Kropp, P. R. The Promise and the Peril of Sex Offender Risk Assessment. Sexual Deviance Issues and Controversies 2008 Ward, T., Laws D. R., and Hudson, S. M. pp 207 - 255

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 26 of 31

## Appendix A
## (graphs)



**FIGURE 3.7.** Recidivism rates (%) plotted for nine age cohorts from 18 to 70+ years of age. Separate plots are provided for three separate offender groups: incest offenders, extrafamiliar child molesters, and rapists. From Hanson (2002, p. 1054). Copyright 2002 by Sage Publications. Reprinted by permission.

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 27 of 31



**FIGURE 3.8.** Recidivism rates (%) replotted as a function of age at release from custody in child molesters, rapists, and incest offenders age 25 and older. From Barbaree, Blanchard, and Langton (2003, p. 64). Copyright 2003 by the New York Academy of Sciences. Reprinted by permission.

Psychological Re-Evaluation: Dr. Donald Lehn, 2/18/10, Pg. 28 of 31



**FIGURE 3.9.** Replotted recidivism as a function of age at release from custody corrected to 5 years' time at risk (data from Barbaree et al., 2003; Fazel et al., 2006; Hanson, 2002, 2006; Thornton, 2006) (total $N$ = 8,879). Correlations indicate goodness of fit of the regression line to observed recidivism over age in these studies.

# Appendix B
## "SVP" Label Ultimate Opinion Confusion

There exists confusion about whether or not an expert mental health professional can or should weigh in regarding the "ultimate" legal opinion as to labeling one a "Sexually Violent Person" (SVP): To adequately examine this topic, some background perspective is warranted.

1. An expert before the court, indeed, anyone testifying in a legal proceeding, has a first and last obligation to tell the truth. The expert takes an oath to do so and may be found guilty of a very serious crime, perjury, if not doing so. The "truth" included the "whole truth," and, for the expert witness, also means testifying to facts and opinions that are grounded in scientific evidence, not mere lay opinion or "ipse dixit." An expert does not ethically offer an opinion from simple authority (argumentum ad vericundium), but bases proffered testimony upon accepted methods that are underpinned by the scientific method, that is, are scientifically accepted. All ethical guidelines for psychologists serving as forensic experts highlight and underscore this overriding duty to the truth. Within the Illinois legal arena, what is generally accepted among professionals largely determines whether or not it is accepted into evidence, i.e., passes the Frye test.

2. SVP determination in Illinois has hinged upon positive answers to three legal questions:
   a) Has someone committed a sexually violent act?
   b) Does the person suffer from a mental disorder?
   c) Does the mental disorder make it "substantially probable" that the person will commit future acts of sexual violence?

The question of a "mental disorder" is made difficult by a confusion of terms, that is, that "mental disorder" is often used loosely and synonymously with "mental illness." However, they are not the same. A mental illness refers to a diagnosis of psychopathology, i.e., a disease, that is rendered by professionals trained and licensed to psychodiagnose. A mental disorder, by contrast, is a legal construct, a legal theory, if you will, that is comprised of an amalgam or conflation of a mental illness with a presumed diminished "volitional (impulse) control" (then linked to the third question to be answered for the act, that of substantial probability to commit future sexual violence). Other examples of legal terms tied to ultimate issues before the courts, but sometimes confused with mental health ones, include "insanity" and "fitness for trial."

A mental health professional is equipped by training and experience to opine about mental health diagnoses, but not to offer ultimate legal opinions. The mental health expert's role is to advise the trier of fact, not attempt to usurp ultimate legal authority. The ethical expert knows the reach of his or her role, authority, and opinion foundation.

3. The issue of opinion foundation relative the expert testimony in SVP matters deserves further explication. Qualified and ethical mental health experts conduct examinations sufficient to render diagnoses, or appropriately qualify the reach of their conclusions. The Diagnostic and Statistical Manual of Mental Disorder, Fourth Edition, Text Revision, (DSM-IV-TR) published by the American Psychiatric Association (2000), is widely relied upon by experts in this country as an authoritative, if not always entirely dispositive, psychodiagnostic classification scheme (nosology). It is presently being revised for the seventh time in 50 years. Revisions occur due to advances in science and changes in cultural conventions but also, sadly, as a result of political considerations, viz., pressure from various lobbying groups. In this respect it differs from classifications of physical diseases. Nevertheless, ethical professionals are obliged to respect conventional clinical standards of practice, the use of an accepted mental health scheme being one, except to the extent that reliably documented advances in science suggest otherwise.

Prefacing passages from DSM-IV-TR, which override specific mental health descriptors, warn evaluators not to use it in a cookbook fashion. One needs also employ clinical judgment. DSM-IV-TR also cautions that diagnoses do not equate with legal "mental disorders," and that awarding a diagnosis does not make for some presumption regarding any behavioral propensities. A diagnosis, therefore, will not automatically render someone unfit for trial, eligible for disability benefits, unable to manage their own funds, etc. The same principal applies to SVP matters, since the science underpinning the DSM-IV-TR cautionary language has not altered. That is, there currently exist no scientific data that allow one to extrapolate an inference from a mere diagnosis that someone has a specific behavioral propensity, in this case diminished volitional capacity leading to specific behavioral likelihoods.

4. The above stated scientific truth is the reason that a reliable expert in an SVP matter does not simply walk into court with diagnoses in hand to opine, based upon those alone, that a person has a certain likelihood to act out. Instead, in addition to a good psychodiagnostic workup, the expert also performs a "risk assessment." Such is necessary since the risk issue has been studied a great deal and a mental illness, per se, has very limited predictive value. Indeed, the actuarial and structured professional

schemes enjoying the most empirical support consist primarily of other predictive factors.

In short, the expert in SVP matters needs a good psychodiagnostic workup and a good risk assessment for founded opinions in court. Where many experts, primarily those hired by the State, go astray, in my view, is in then overreaching beyond the science to opine re the "volitional impairment" causal nexus prong. They opine beyond the science in an ipse dixit fashion to proffer testimony in reference to ultimate legal opinions before the triers of fact. The State hired experts apparently rationalize their opinions as "common sense," when their mission is to offer expert, not lay, testimony, and to not mislead the trier of fact in so doing. This misleading could be viewed as untruthful (perjurous). It certainly appears to stretch the bounds of honest, ethical conduct by straying from "generally accepted" clinical practice as illustrated and embodied in the prefacing cautionary language of DSM-IV-TR.

5. Well trained and qualified experts can certainly advise the courts in SVP matters by addressing elements of the act about which they can reasonably opine. They appear to disserve and mislead when opining beyond that which is ethically and scientifically defensible. Good experts can defend what they share but also know the limits of their knowledge and do not pretend otherwise because of pressure from some hiring body or trier of fact. What may seem easy and convenient is not always right. Legal theories like "mental disorder" in SVP cases do not always enjoy ready scientific support.

Kirk Witherspoon, Ph.D.
Clinical & Forensic Psychologist
11/2009

LEUPROLIDE ACETATE
LEUPRON DEPOT          3.75, 7.5  MONTHLY
                       11.25 mg – 3 MONTHS
                       22.5 mg – 3 MONTHS
                       30 mg – 4 MONTHS

DESCRIPTION:
    Synthetic form of a naturally occurring gonadotropin releasing hormone (GnRH.)

DEFINITIONS:
    Gonadotropins are hormones that have a stimulating effect on the gonads (testicles.)
FSH and LH are the two hormones produced by the pituitary gland (located in the brain)
that stimulate the testicles to produce testosterone.

GnRH is a hormone that usually is produced in a pulsitile fusion or in bursts.  This
stimulates the pituitary gland to release FSH and LH resulting in subsequent production
of testosterone from the testes.

Lupron, a synthetic form of GnRH, is given as a Depot which is injected into the muscle
and released over time into the blood stream in a constant stable level as opposed to a
pulsitile fusion.  This chronic stimulation of the pituitary gland results in a suppression in
the production of FSH and LH and consequent suppression of testicular production of
testosterone.  These effects are reversible on discontinuation of drug therapy.

Testosterone levels close to zero can usually be achieved with adequate doses of Lupron.

Some studies have shown that sex offenders had no relapses if they remained under
treatment with Lupron.  Duration of follow-up in these studies was between six months to
seven years.

INFORMED CONSENT:
    Lupron will be administered for Behavior Modification, i.e., decrease in sexual
deviant fantasies and behavior and relapse.  Lupron produces the clinical symptoms of
hypogonadism, (low testosterone), and its sequelae, including sexual dysfunction.

Animal studies of Lupron have demonstrated atrophy of testicles.  Studies exploring the
long the long term reversibility of these changes have not been published.  Therefore,
there is a risk of permanent loss of fertility and sex drive in addition to other side effects.

WARNINGS:
    Lupron causes a transitory increase in testosterone and possible increase in sex drive
for as long as two weeks.

Lupron should not be administered to patients with known pituitary pathology.  To screen
for such pathology, blood work is done prior to administrtion fo Lupron.

LUPRON DEPOT

Lupron has been associated with cardiovascular side effects such as:
    Worsening of coronary artery disease
    Congestive heart failure
    Changes in blood pressure.
Blood pressure and ECG will be checked prior to and during Lupron treatment.

Chronic use of Lupron can predispose patients to osteoporosis (weakening of the bones.) Bone density studies are done before administration of Lupron and yearly. Osteoporosis is treatable if it occurs.

POSSIBLE SIDE EFFECTS:
    Common side effects from Lupron include:
        General pain
        Headache
        Hot flashes / sweats
        Joint pain
        Mood fluctuations

Other possible side effects include:
    Skin reactions
    Dizziness
    Numbness
    Muscle pain
    Swelling (water retention)
    Dehydration
    Flu like syndrome
    Stomach upset
    Diarrhea
    Restlessness
    Weight changes
    Impotence
    Decreased libido

REFERENCES:
    Reilly, Dr. et al. Protocols for the use of cyproterone, medroxy progesterone and Leuprolide in the treatment of paraphilia. Canadian Journal of Psychiatry, 2000; 45: 559-563.

Physicians Desk Reference, 2004.

M. BEDNARZ, MD

# Curriculum Vitae

**Name:**      Donald A. Lehn, Ph.D.

**Address:**    Treatment and Detention Facility
Illinois Department of Human Services
R.R. 1, Box 6A
Rushville, IL 62681

**Personal Information:**

Date and Place of Birth: May 25, 1962
West Bend, Wisconsin

**Education:**

B.S. Chemistry / Biochemistry (1984)
University of Wisconsin - Milwaukee

B.S. Zoology (1984)
University of Wisconsin - Milwaukee

M.S. Biochemistry (1988)
Washington State University

Ph.D. Biochemistry (1989)
Washington State University

For informational purposes.

## Work Experience:

1983-1995    Assistant Scientist (Research Assistant Professor), Department of Pediatrics, University of Wisconsin – Madison.

1992-1993    Research Associate, Department of Pediatrics, University of Wisconsin-Madison.

1989-1992    Guest Researcher, Protein Section, Laboratory of , Molecular Carcinogenesis, National Cancer Institute, National Institutes of Health, Bethesda, Maryland (Employed by the National Research Council of the National Academy of Sciences to study the expression and function of HMG proteins.)

1985-1989    Research Assistant, Program in Biochemistry and Biophysics, Washington State University. (Employed by Dr. Raymond Reeves to study the protein HMG-I and its interactions with nucleic acids.) 1984-1985 Research Assistant, Bioanalytical Center, Washington State University (Employed by Dr. Ronald Brosemer to develop an HPLC based system for amino acid analysis.)

1983-1984    Laboratory Assistant, Department of Chemistry) University of Wisconsin - Milwaukee. (Employed by Dr. David H. Petering in conjunction with an undergraduate research project to study the effects of Nitrilotriacetic Acid (NTA) on intracellular zinc, copper and cadmium.)

1980-1981    Research Technician, Department of Chemistry University of Wisconsin - Milwaukee. (Employed by Dr. Keith Hall to assemble and operate an analytical ultra-micro balance to measure the absorption of various gases on Yttrium metal complexes.)

## Teaching Experience:

1987    Teaching Assistant, Department of Biology Washington State University. (1 semester of Introductory Biology)

1985-1987    Teaching Assistant, Department of Chemistry, Washington State University. (4 semesters of Introductory and General Chemistry)

1991    Guest Lecturer - Biochemistry, Moscow State University (Spent 2 weeks presenting lectures on chromatin, High Mobility Group (HMG) proteins, computer analysis of DNA and Proteins, and the use of electronic mail to access world wide computer resources.

1993-1995    Lecturer (part-time), University of Wisconsin Medical School. (Presented several lectures on non-histone chromosomal proteins, chromatin structure and gene expression.)

**Committees and Academic Governance:**

| | |
|---|---|
| 1986-1989 | Washington State University - Graduate and Professional Student Association Executive Council Member |
| 1985-1986 | Washington State University - Faculty Senate Graduate Student Representative. |
| 1985-1987 | Washington State University Planning Committee. |
| 1985-1986 | Washington State University Research and Arts Committee. |
| 1985-1986 | Washington State University Organization and Structure Committee. |
| 1984-1985 | Graduate and Professional Student Association Representative for Program in Biochemistry. |
| 1983-1984 | Sandburg Halls Administrative Council (SHAC) Assistant Programing Director |
| 1980-1984 | SHAC Senate Representative |

**Scholarships, Awards and Honorary Societies:**

| | |
|---|---|
| 1988, 1989 and 1991 | National Research Council/National Academy of Sciences, Resident Research Award. |
| 1987 | Office of Grant and Research Development Competitive Research Grants-in-Aid Summer Stipend. |
| 1980, 1982 and 1983 | - Freida Myer Nishan Memorial Scholarship. |
| 1981 | Sigma Epsilon Sigma national honor fraternity |
| 1980 | National Honor Society |
| 1980 | RMH Medical Careers Scholarship |

## Conferences and Symposia:

1984   14th Annual Wisconsin Undergraduate Research Symposium.

1986   Pacific Slope Biochemical Conference. Vancouver, British Columbia.

1986   Sixteenth Steenbock Symposium: RNA Polymerase and the Regulation of Transcription. University of Wisconsin - Madison.

1986   Eighth Annual West Coast Chromatin and Chromosomes Conference. Asilomar, California.

1988   Beckman Liquid Chromatography Course and Workshop. Washington State University.

1991   American Association of Cancer Research Annual Meeting. Houston, Texas.

1991   National Institutes of Health Workshop on Extramural Programs and Grant Support. (This was a workshop on how to write and submit a research proposals that will have a high chance of being funded.)

1992   First Annual Ben May Symposium. University of Chicago. Chicago, Illinois.

## Presentations:

1.   Donald A. Lehn, Susan Krezoski and David H. Petering. 1984. Interactions of Metal Binding Ligands With Ehrlich Cells: Effects of Nitrilotriacetic Acid (NTA) on Zinc, Copper and Cadmium Distribution and Cell Proliferation. 14th Annual Wisconsin Undergraduate Research Symposium.

2.   Donald A. Lehn. 1986. Novel Properties of HMG-I. Eighth Annual West Coast Chromatin and Chromosomes Meeting.

3.   Donald A. Lehn. 1989. The Nonhistone Protein HMG-I(Y) and its Interactions With Nucleic Acids. NIH/NCI/DCE/LMC invited lecture.

4.   Donald A. Lehn and Michael Bustin. 1991. Preliminary Analysis of the HMG-14 promoter Region. National Institutes of Health Research Festival presentation.

5.   Donald A. Lehn. 1991. The High Mobility Group Proteins. Department of Biochemistry, Moscow State University invited lecture.

6.   Donald A. Lehn. 1991. Accessing Genbank, EMBL and Other Databanks via Electronic Mail. Department of Biochemistry, Moscow State University invited lecture.

7.   Donald A. Lehn. 1991. The High Mobility Group Proteins. Engelhardt Institute of Molecular Biology, USSR Academy of Sciences invited lecture.

8.   Donald A. Lehn. 1991. Accessing Genbank, EMBL and Other Databanks via Electronic Mail. Engelhardt Institute of Molecular Biology, USSR Academy of Sciences invited lecture.

## Publications:

1. Raymond Reeves, Terry S. Elton, Mark S. Nissen, Donald Lehn and Kenneth R.. Johnson. 1987. Posttranscriptional gene regulation and specific binding of the nonhistone protein HMG-I by the 3' untranslated region of bovine interleukin 2 cDNA. Proc. Natl. Acad. Sci. 84:6531- 6535.

2. Donald A. Lehn, Terry S. Elton, Kenneth R. Johnson and Raymond Reeves. 1988. A Conformational Study of the Sequence Specific Binding of HMG-I (Y) With the Bovine Interleukin-2 cDNA. Biochemistry International 16(5):963-971.

3. Kenneth R. Johnson, Donald A. Lehn, Terry S. Elton, Philip J. Barr and Raymond Reeves. 1988. The Chromosomal Protein HMG-I(Y): Complete Murine cDNA Sequence, Genomic Structure and Tissue Expression. J. Biol. Chem. 263:18338-18342.

4. Kenneth R. Johnson, Donald A. Lehn and Raymond Reeves. 1989. Alternate Processing of mRNAs Encoding Mammalian Chromosomal High-Mobility-Group Proteins HMG-I and HMG-Y. Molecular and Cellular Biology, 9(5):2114– 2123.

5. Donald A. Lehn. 1989. The Non-histone Chromosomal Protein HMG-1(Y) and its Interactions with Nucleic Acids. Ph.D. Dissertation. Washington State University.

6. Michael Bustin, Donald A. Lehn and David Landsman. 1990. Structural Features of the HMG Chromosomal Proteins and Their Genes. Biochem. Biophys. Acta. 1049:231-243.

7. Michael Bustin, Patricia S. Becerra, Massimo P. Crippa, Donald A. Lehn, James M. Pash and Joseph Shiloach. 1991. Recombinant Human Chromosomal Proteins HMG-14 and HMG-17. Nucleic Acids Research, 19(11):3115-3121.

8. Donald A. Lehn and Michael Bustin. 1993. Evolutionary Conserved Motifs and Protein Binding Elements in the 5' Region of the Chromosomal Protein HMG-14 Gene. DNA and Cell Biology, 12(8):753-761.

9. Laura J. Brown, Michael J. MacDonald, Donald A. Lehn, and Susan M. Moran. 1994. Sequence of Rat Mitochondrial Glycerol-3-phosphate Dehydrogenase cDNA. J. Biol. Chem. 269:14363-14366.

10. Yuri V. Postnikov, Donald A. Lehn, Robert C. Robinson, Fred K. Friedman, Joseph Shiloach and Michael Bustin. 1994. The Cooperative Binding of Chromosomal Protein HMG-14 to Nucleosome Cores is Reduced by Single Point Mutations in the Nucleosomal Binding Domain. Nucleic Acids Research, 22(21):4520-4526.

11. Donald A. Lehn, Laura J. Brown, Gregg D. Simonson, Susan M. Moran, and Michael J. MacDonald. 1994. The Sequence of a Human Mitochondrial Glycerol-3-phosphate Dehydrogenase-Encoding cDNA. Gene, 150:417-418.

12. Daniel R. McFarland, Donald A. Lehn, Susan M. Moran, Michael J. MacDonald and Miles L. Epstien. 1995. Sequence of a cDNA Encoding Chicken Vasoactive Intestinal Peptide (VIP). Gene, 154:211-213.



UNIVERSITY OF
WISCONSIN–MADISON
MEDICAL SCHOOL

*Where I worked at time of arrest.*
*DS.*

August 25, 1995

Mr. Donald A. Lehn
Lake County Jail
P.O. Box 38
Waukegan, Illinois 60079-38

Dear Mr. Lehn:

The purpose of this letter is to notify you that the Department of Pediatrics is placing your appointment as Assistant Scientist on leave of absence without pay effective August 2, 1995, because of your absence from your job. This leave without pay will extend through December 31, 1995, which coincides with the termination of your employment in the Department of Pediatrics as stated in the letter of nonrenewal you received dated June 16, 1995. If you wish and are able to return to work for a period between now and December 31, 1995, please notify Sandra Grieger-Block so that prior arrangements can be made.

An "Insurance Prepayment Form" is enclosed to enable you to prepay insurance premiums if you wish. To do so, you should fill in the column "Amount Enclosed" for the number of months you wish to continue your coverages. Please note that the premium for the Individual and Family Life Insurance requires a separate check made payable to "Employee Life Fund." All other premiums can be paid with one check made payable to "University of Wisconsin." Please sign and date the blue form, enclose all required checks, and return these items to the following address as soon as possible:

> Jeanette Holz
> Department of Pediatrics
> 600 Highland Ave., H4/459 CSC
> Madison, WI 53792-4108

In addition, the annual deduction for the University Insurance Association life insurance is normally taken on the October payroll, but you will be on leave of absence at that time. If you wish to continue your coverage for another year, you will need to pay the annual premium of $24 on your own. A continuation notice is enclosed for this purpose. Please send the form and a check to the National Guardian Life Insurance Company.

Sincerely,

Michael J. MacDonald, M.D.
Professor of Pediatrics
Head, Pediatric Diabetes and Endocrinology Division

Sandra Grieger-Block
Administrative Officer
Department of Pediatrics

Enclosures
[Lehn - LWOP]

Department of Pediatrics

*R95 239 978*



# DISTRICT COURT OF MARYLAND FOR Montgomery County
Located at 27 Courthouse Square, Rockville, Maryland 20850

Case No.: 1D00023101

### STATE OF MARYLAND

VS

LEHN, DONALD A
E4556A Schuette Road
Reedsburg, WI 00000

*Where I lived at time of arrest DL.*

CC#:

Local ID:

Race: *W* Sex: M  Ht: *5-10* Wt: *175* Hair:

DOB *05/25/62*  Phone(H):  /(W):

SID:

DL#:

Eyes:

Charge | Statute | Arrest
CHILD PORN FILM IN SEX ACT |27 419A |
SEX OFF 3RD D UNDR AGE VCT |27 464B |

Charge | Statute | Arrest
CHILD PORN FILM IN SEX ACT |27 419A |
CHILD ABUSE:CUSTODIAN |27 35C |

## ARREST WARRANT ON CHARGING DOCUMENT

STATE OF MARYLAND, Montgomery County:
TO ANY PEACE OFFICER, Greetings:
   YOU ARE ORDERED to arrest and bring before a judicial officer the above-named Defendant as soon as practicable and without unnecessary delay. If a judicial officer is not readily available, this Warrant shall authorize the prisoner's detention until compliance is had with Rule 4-212 and the arresting officer is authorized and required to comply with Rule 4-212.

### IF THE DEFENDANT IS NOT IN CUSTODY FOR ANOTHER OFFENSE,
Initial appearance is to be held in county in which Defendant is arrested.

   IF THE DEFENDANT IS IN CUSTODY FOR ANOTHER OFFENSE, this Warrant is to be lodged as a detainer for the continued detention of the Defendant for the offense charged in the charging document. When the Defendant is served with a copy of the charging document and Warrant, the Defendant shall be taken before a judical officer of the District Court.

Date: 10/20/95 Time: 09:26:22   Judge/Commissioner: _____ ID: 6501

Given to: MONTGOMERY COUNTY POLICE-HEADQUARTERS

## RETURN OF SERVICE

☐  I certify that at _____ M. on _____ at _____
_____, I executed this Arrest Warrant by arresting the Defendant
and delivered a copy of the Statement of Charges to the Defendant.

☐  I left a copy of the Warrant and Charging Document as a detainer for the continued detention of the Defendant at:

   Facility: _____

   Location: _____

Signature & Title of Peace Officer: _____

   Printed Name of Officer: _____

   Agency, Sub-Agency, I.D.: _____

   Date: _____

*Certified to be a true copy of original.*

_____
Commissioner   Date
0502   CA

Tracking No. 951001714176

ARREST WARRANT ON CHARGING DOCUMENT